THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
Feb. 1, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re South Park Cigar, Inc.
_____

Serial No. 78486382
_____

Charles W. Grimes of Grimes & Battersby LLP for South Park
Cigar, Inc.

Daniel Brody, Trademark Examining Attorney, Law Office 115
(Tomas V. Vlcek, Managing Attorney)
_____

Before Grendel, Rogers and Cataldo, Administrative
Trademark Judges.

Opinion by Grendel, Administrative Trademark Judge:


**INTRODUCTION**

Applicant seeks registration on the Principal Register

of the mark **YBOR GOLD** (in standard character form) for

goods identified in the application as "cigars, pipe tobacco and roll-your-own tobacco," in Class 34.[1]

At issue in this appeal are the Trademark Examining Attorney's final refusals to register applicant's mark on two grounds, first, that the mark is deceptive and thus unregistrable under Trademark Act Section 2(a), 15 U.S.C. §1052(a), and second, that the mark is primarily geographically deceptively misdescriptive and thus unregistrable under Trademark Act Section 2(e)(3), 15 U.S.C. §1052(e)(3).[2]  The appeal is fully briefed.

**REFUSALS AT ISSUE ON APPEAL**

Initially, we must clarify what we deem to be the proper statutory basis for refusal in this case.  To maintain a Section 2(a) deceptiveness refusal, the Office must establish that (1) the mark misrepresents or misdescribes the goods, (2) the public would likely believe

---

[1] Serial No. 78486382, filed on September 20, 2004.  The application is based on applicant's allegation of a bona fide intent to use the mark in commerce, under Trademark Act Section 1(b), 15 U.S.C. §1051(b).

[2] Trademark Act Sections 2(a) and 2(e)(3) provide in pertinent part as follows:  "No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused on the principal register on account of its nature unless it— (a) Consists of or comprises immoral, deceptive, or scandalous matter; ... (e) Consists of a mark which ... (3) when used on or in connection with the goods of the applicant is primarily geographically deceptively misdescriptive of them...."

the misrepresentation, and (3) the misrepresentation would materially affect the public's decision to purchase the goods. *In re California Innovations Inc.*, 329 F.3d 1334, 1336-37, 66 USPQ2d 1853, 1854 (Fed. Cir. 2003), citing *In re Budge Mfg. Co.*, 857 F.2d 773, 775, 8 USPQ2d 1259, 1260 (Fed. Cir. 1988). To maintain a refusal under Section 2(e)(3), the Office must establish that (1) the primary significance of the mark is a generally known geographic location, (2) the consuming public is likely to believe the place identified by the mark indicates the origin of the goods bearing the mark, when in fact the goods do not come from that place, and (3) the misrepresentation would be a material factor in the consumer's decision to purchase the goods. *California Innovations, supra,* 329 F.3d at 1341, 66 USPQ2d at 1858.

The addition of a materiality element to the Section 2(e)(3) test is "due to the NAFTA changes in the Lanham Act." *Id*. The materiality showing now required in both the Section 2(a) and Section 2(e)(3) refusals "equates this test [under Section 2(e)(3)] with the elevated standard applied under §1052(a)." *Id.*, 329 F.3d at 1340, 66 USPQ2d at 1857. However, the court went on to state that

> geographic deception is specifically dealt with
> in subsection (e)(3), while deception in general

> continues to be addressed under subsection (a).
> Consequently, this court anticipates that the PTO
> will usually address geographically deceptive
> marks under subsection (e)(3) of the amended
> Lanham Act rather than subsection (a). While
> there are identical legal standards for deception
> in each section, subsection (e)(3) specifically
> involves deception involving geographic marks.

*Id.,* 329 F.3d at 1341-42, 66 USPQ2d at 1858.

Thus, in keeping with the Court's instructions and its construction of the statute, we deem the appropriate refusal in this case involving an allegedly geographically deceptive mark to be only the Section 2(e)(3) "primarily geographically deceptively misdescriptive" refusal, and not the Section 2(a) deceptiveness refusal.[3] *See United States*

---

[3] In TMEP section 1210.05(a), it is stated that:

> ...because the statute expressly prohibits registration of
> deceptive marks on the Supplemental Register or on the
> Principal Register under §2(f), the examining attorney will
> initially refuse registration of geographically deceptive
> marks under both §§2(a) and 2(e)(3). If the applicant
> alleges use in commerce prior to December 8, 1993 and
> amends to the Supplemental Register, or establishes that
> the proposed mark acquired distinctiveness under §2(f)
> before December 8, 1993, the examining attorney will
> withdraw the §2(e)(3) refusal, but will not withdraw the
> §2(a) refusal.

It would appear to us that the converse is also true in a case
like the case at bar involving a geographic mark: unless the
applicant is seeking registration on the Supplemental Register
with a claim of first use in commerce predating the NAFTA
implementation date of December 8, 1993, or is seeking
registration on the Principal Register under Section 2(f) based
on a claim that the mark had acquired distinctiveness prior to
December 8, 1993, the proper refusal is under Section 2(e)(3),
not Section 2(a), and the Section 2(a) refusal, if made, should
be withdrawn.

*Playing Card Company v. Harbro, LLC*, ___ USPQ2d ___,
Opposition No. 91162078 (TTAB, December 14, 2006).

An additional issue is presented by the record in this
case.  As noted above, one element of the Section 2(e)(3)
refusal includes a showing that the applicant's goods in
fact do not come from the place named in the mark.  If the
goods in fact come from the place named in the mark, then
the proper refusal is that the mark is primarily
geographically descriptive, under Section 2(e)(2).  Such a
refusal, in appropriate cases, may be obviated by
applicant's submission of a disclaimer of the geographic
term.  In the present case, applicant has maintained
throughout prosecution and on appeal that its goods in fact
may or will come from the geographic place named in the
mark, that the second element of the Section 2(e)(3)
refusal therefore has not been and cannot be established by
the Trademark Examining Attorney, and that applicant is
willing to submit a disclaimer of YBOR if such disclaimer
will put the application in condition for publication.
However, as discussed more fully below in connection with
the second element of the Section 2(e)(3) refusal, we agree
with the Trademark Examining Attorney's contention that
applicant has not established that its goods in fact come
or will come from the place named in the mark.  In view of

this finding, we conclude that Section 2(e)(2) is not a proper basis for refusal and that applicant's proffered disclaimer of YBOR does not suffice to overcome a Section 2(e)(3) refusal. *See In re Wada*, 194 F.3d 1297, 52 USPQ2d 1539 (Fed. Cir. 1999).

In short, we find that the proper refusal at issue in this appeal is the Section 2(e)(3) "primarily geographically deceptively misdescriptive" refusal. We turn now to consideration of that refusal.


**SECTION 2(e)(3) REFUSAL**

As noted above, the elements of a Section 2(e)(3) refusal are as follows: (1) the primary significance of the mark is a generally known geographic location; (2) the consuming public is likely to believe the place identified by the mark indicates the origin of the goods bearing the mark (i.e., that a goods/place association exists), when in fact the goods do not come from that place; and (3) the misrepresentation would be a material factor in the consumer's decision to purchase the goods. *California Innovations, supra,* 329 F.3d at 1341, 66 USPQ2d at 1858.

Stated briefly, it is the Trademark Examining Attorney's position that the primary significance of applicant's mark YBOR GOLD is that of a generally known

6

geographic place, i.e., the "Ybor City" area of Tampa, Florida, also known as "Ybor" for short; that a goods/place association exists between that geographic place and applicant's goods; that applicant's goods in fact do not come from the place named; and that this misrepresentation would be material to the consumer's decision to purchase the goods.

For its part, applicant argues that "Ybor City" is not a generally known geographic location; that in any event the primary significance of applicant's mark is not that of this geographic location; that there is no goods/place association between the place named in the mark and applicant's goods; that applicant's goods in fact come from or will come from the place named in the mark; and that any geographical misrepresentation resulting from applicant's use of the mark on its goods is not or would not be material to the consumer's decision to purchase the goods.

**THE EVIDENCE**

The Internet evidence of record (submitted by both applicant and the Trademark Examining Attorney)

reveals the following.[4]

The website www.placesnamed.com has an entry for "Ybor City," identifying it as a location in Hillsborough County, Florida.

The website www.maps.yahoo.com includes an entry for "Ybor City, FL," showing it to be a location within Tampa, Florida.

The website www.tampa.gov.net includes a "Neighborhood Information Page" which itself includes the following listing for "Ybor City":  "The Ybor City Area is located in the east-central part of Tampa, bounded on the north by 26th Avenue, the east by 37th Street, the south by Adamo Drive and Cass Street, and the west by Nebraska Avenue and I-275."

The website of Frommer's travel guide, at www.frommers.com, lists "Ybor City" as an attraction located in Tampa, Florida, and includes the following information:

> **Ybor City**
>    Northeast of downtown, the city's historic Latin district takes its name from Don Vicente Martinez Ybor (Eeee-bore), a Spanish cigar maker who arrived here in 1886 via Cuba and Key West.

---

[4] As discussed more fully below, we have given no consideration to the alleged Internet evidence cited by applicant for the first time in its reply brief.

Soon his and other Tampa factories were producing more than 300,000 hand-rolled stogies a day.

It may not be the cigar capital of the world anymore, but Ybor is still smokin' as the happening part of Tampa, and it's one of the best places in Florida to buy hand-rolled cigars.  ...

...

Even if you're not a cigar smoker, you'll enjoy a stroll through the Ybor City State Museum, ... housed in the former Ferlita Bakery.... You can take a self-guided tour to see the collection of cigar labels, cigar memorabilia, and works by local artisans. ...admission includes a 15-minute guided tour of La Casita, a renovated cigar worker's cottage adjacent to the museum; it's furnished as it was at the turn of the last century.  ...  Better yet, plan to catch a cigar-rolling demonstration (ongoing; no specific schedule), held Friday through Sunday from 10am to 3pm.

On the website of Fodor's, another travel guide, at www.fodors.com, the entry for "Ybor City" includes the following information:

**Ybor City**
One of only three National Historic Landmark districts in Florida, lively Ybor City, Tampa's Latin quarter, has antique-brick streets and wrought-iron balconies.  Cubans brought their cigar-making industry to Ybor (pronounced ee-bore) City in 1886, and the smell of cigars – hand-rolled by Cuban immigrants – still wafts through the heart of this east Tampa area, along with the strong aroma of roasting coffee.  These days the neighborhood is emerging as Tampa's hot spot as empty cigar factories and historic social clubs are transformed into trendy boutiques, art galleries, restaurants and nightclubs that rival those on Miami's sizzling South Beach.  ... Guided walking tours of the area ($5) enable you to see artisans handroll cigars following time-honored methods.  ...  The Ybor City Museum State

9

Park provides a look at the history of the cigar industry.  ...

The website of the <u>Ybor Times</u> (www.ybortimes.com) includes the following information under the heading "Cigars in Ybor":

> Do you know how Ybor City came to be known as Cigar City, USA?  In 1886 cigarmakers Vicente Martinez-Ybor and Ignacio Haya moved their cigar factories from Key West to Tampa.  Tampa had everything the cigarmakers needed:  a railroad, a port and a warm climate that provided a natural humidor for the tobacco leaf.  Once the cigarmaking was under way, Ybor City became home to Cuban, Spanish and Italian immigrants who worked in more than 140 cigar factories in and around the area, producing 250 million cigars a year.  For more than half a century, Ybor City was the "Cigar Capital of the World."  Though the cigar business faded during the last few decades, the 1990's have seen a dramatic renewal in the cigar culture.  Today, the streets of Ybor City are again home to a slew of cigar stores and carts.  And visitors to historic Ybor Square can still watch artisans roll a fresh cigar by hand. Vicente and Ignacio would be proud.

The website then goes on, under the heading "Ybor's cigar industry," to give the names, addresses and phone numbers of ten cigar retail stores, twelve mail order cigar retailers, and four cigar manufacturers, all located in Ybor City.

The website of the Ybor City Chamber of Commerce, at ybor.org/infocenter, includes the following information:

10

> Whether you are a history buff, cigar aficionado or simply looking for "Florida's Latin Quarter Experience" the visitor information center at Centro Ybor is just for you!  Housed inside the Cigar Museum and designed as an opened cigar box, this charming facility serves as a one-stop visitor center providing information about accommodations, events, attractions, shopping, dining and entertainment.  Surrounded by cigar art, a historical film theater, souvenir shop and brochures that offer endless resources and ideas for you to plan your "Latin Quarter Experience."

The website infoplease.com (submitted by applicant) includes the following entry for Vicente Martinez Ybor, who founded Ybor City:

> Ybor grew up in Spain and at age 14 immigrated to Cuba, which was then a Spanish colony.  There he worked in Cuba's most famous industry, the making of cigars.  In 1868, the Cuban revolution for independence from Spain broke out.  To avoid war, Ybor moved to Key West, Florida.  He opened a cigar making business there, but after a number of labor disputes, moved to Tampa.  In 1885, he bought large tracts of land at the outskirts of Tampa and built a factory.  He later bought even more land and called the area Ybor City.  Within a few years, the city grew to 3,000 residents, and the area became a famous center for making fine cigars.  It also became a center for Cuban culture in Florida, since so many of the cigar workers were from Cuba or of Cuban descent. Jewish, German, and Italian immigrants also flocked to Ybor City.  By 1900, the city was known as "the cigar capital of the world."  The industry began to decline, however, and in the 1920s and 1930s many of Ybor City's employees lost their jobs in the cigar factories.  Today, parts of Ybor City have been restored as a historic landmark district.

11

The Trademark Examining Attorney also has submitted excerpts from numerous news articles obtained from the NEXIS database.  These excerpts all refer to "Ybor City" as a neighborhood or area located in Tampa, Florida.  Several of the excerpts also refer to the area simply as "Ybor."

**Element 1:  Is the primary significance of the mark a generally known geographic location?**

We turn to the first element of the Section 2(e)(3) refusal, i.e., whether the primary significance of applicant's mark YBOR GOLD is that of a generally known geographic location.

Based on the evidence of record, we find, first, that "Ybor City" is the name of a generally known geographic place, i.e., a specific neighborhood or area located in Tampa, Florida.  As noted above, "Ybor City" is listed and has an entry on the "placesnamed" website, and on the Yahoo maps website.  It is listed on the website of the city of Tampa as one of the recognized neighborhoods in the city. It has its own listings or entries in the travel guides Frommer's and Fodor's.  Information about Ybor City is included on the website of the Ybor Times, as well as on the website of the Ybor City Chamber of Commerce.  Numerous references to Ybor City are found in the NEXIS evidence

submitted by the Trademark Examining Attorney. This type of evidence is highly relevant to the issue of whether Ybor City is a generally known geographic location. *See, e.g., In re Les Halles De Paris J.V.*, 334 F.3d 1371, 67 USPQ2d 1539 (Fed. Cir. 2003)(noting that examiner's evidence included "articles and travel brochures about the Jewish quarter or neighborhood in Paris known as Le Marais").

Taken together, we find that all of this evidence establishes that "Ybor City" is a generally known geographic location. On this record, Ybor City is neither obscure nor remote, especially to the relevant purchasing public, i.e., cigar aficionados specifically and, more generally, people who are or may be traveling to Tampa, Florida. *See In re MCO Properties Inc*., 38 USPQ2d 1154 (TTAB 1995)(whether place is generally known is determined not in the abstract or with reference to the nationwide purchasing public, but rather with reference to the relevant purchasing public for the goods or services in question).

Applicant argues that Ybor City is not a generally known geographic location because its boundaries are ill-defined. In support of this contention, applicant relies on several Internet websites, from which applicant has quoted in its reply brief. However, copies of the

printouts of the websites were not made of record prior to appeal or submitted with the reply brief. We give this unsubmitted Internet evidence no consideration. See Trademark Rule 2.142(d).[5] We find instead that Ybor City is a well-defined and known neighborhood in Tampa, Florida. See the "Neighborhood Information Page" of the tampa.gov website referred to earlier, which sets out the specific boundaries of the neighborhood known as Ybor City.

Applicant also argues that Ybor City is not a generally known geographic location because the evidence shows that it is not a "single" place. Applicant contends that there are numerous locations within Tampa, the names of which include the term "Ybor." These include "Ybor," "Ybor City," "Ybor Square," and "Centro Ybor." We are not persuaded by this argument. It is clear from the evidence cited by applicant that all of these places are within Ybor City, and derive their "Ybor" names from that fact. Moreover, even if applicant were correct in asserting that "Ybor" identifies more than one location, it is settled that the existence of more than one location bearing the name in question does not detract from the geographical

---

[5] We add that even if we had considered applicant's mere quotations as actual Internet evidence which was properly made of record, it would not change our determination of this issue.

14

significance of the term for purposes of Sections 2(e)(2) or 2(e)(3). *See, e.g., In re Loew's Theatres, Inc.*, 749 F.2d 764, 226 USPQ 865 (Fed. Cir. 1985)(DURANGO); *In re Cambridge Digital Systems*, 1 USPQ2d 1659 (TTAB 1986)(CAMBRIDGE).

For these reasons, we find that "Ybor City" is a generally known geographic location.

We find, next, that the primary significance of applicant's mark YBOR GOLD is that of this generally known geographic location, Ybor City.

Applicant argues, to the contrary, that even if Ybor City is a generally known geographic location, applicant's mark includes only the word YBOR, not the words YBOR CITY. We are not persuaded. It is settled that terms commonly used as shorthand or truncated references or nicknames for a place are as primarily geographically descriptive (or misdescriptive) of a place as are the full place names. *See United States Playing Card Company v. Harbro, LLC*, *supra* (VEGAS recognized as shorthand reference to Las Vegas, Nevada, and thus is a primarily geographic term); *In re Carolina Apparel*, 48 USPQ2d 1542 (TTAB 1998)(CAROLINA recognized as shorthand reference to either North or South Carolina, and thus is a primarily geographic term).

The evidence of record contains numerous examples of the designation "Ybor" alone being used as a shorthand reference or a nickname for Ybor City.  See, e.g., the Frommer's travel guide listing for "Ybor City" quoted above, which includes the following:  "It may not be the cigar capital of the world anymore, but Ybor is still smokin' as the happening part of Tampa..."  We note as well that the local newspaper for Ybor City is called the Ybor Times, not the "Ybor City Times."  The website of this newspaper, excerpts of which are quoted above, includes information under the heading "Ybor's cigar industry."  Many of the NEXIS excerpts made of record by the Trademark Examining Attorney refer to Ybor City simply as "Ybor."

Next, as noted above, applicant has contended that the evidence establishes that there are numerous locations within Tampa, the names of which include the term "Ybor," including "Ybor Square," and "Centro Ybor."  Also as noted above, it is clear that these places are within Ybor City, and derive their "Ybor" names from that fact.  Supporting our finding that "Ybor" is used as shorthand for "Ybor City" is the fact that these places are called "Ybor

16

Square" and "Centro Ybor," and not "Ybor City Square" and "Centro Ybor City."[6]

In short, we reject applicant's argument that YBOR, when standing alone (and as opposed to "Ybor City"), is not a primarily geographic term.

In its response to the first Office action, applicant asserted that "Applicant chose 'YBOR' as part of its mark because of the man, Vicente Martinez Ybor, for whom the 'Ybor City' section of Tampa, Florida, was named." This assertion or argument has not been mentioned in either applicant's main appeal brief or its reply brief. In the interest of completeness, however, we shall discuss the issue. First, applicant's "intent" in adopting its mark is not relevant or probative of the issue at hand, i.e., whether consumers will regard YBOR as a primarily geographic term. *See, e.g., In re House of Windsor, Inc.*, 221 USPQ 53, 56 (TTAB 1983). Next, to the extent that applicant is arguing that the primary significance of YBOR is that of a surname, rather than that of a geographic location, we find that the record simply does not support

---

[6] We also note, for whatever probative value it may have, that applicant itself concludes its reply brief by stating: "In the present application, the evidence of record shows that the goods will originate in the place identified in the mark, namely the Ybor section of Tampa, to the extent that such a place can be identified." (Reply brief at 6.)

17

such a contention.  The record shows only one person named "Ybor," i.e., the nineteenth-century cigar maker Vicente Martinez Ybor, the founder of Ybor City.

Finally, there is another issue pertaining to the first element of the Section 2(e)(3) refusal that was never raised or argued by applicant but which we find necessary to determine, again in the interest of completeness.  It is settled that

> [u]nder the first prong of the test – whether the mark's primary significance is a generally known geographic location – a composite mark such as the applicant's proposed mark must be evaluated as a whole.  ...  It is not erroneous, however, for the examiner to consider the significance of each element within the composite mark in the course of evaluation the mark as a whole.

*California Innovations, supra*, 329 F.3d at 1342, 66 USPQ2d at 1858, quoting from *In re Save Venice New York, Inc.,* 259 F.3d 1346, 1352, 59 USPQ2d 1778, 1782 (Fed. Cir. 2001). *See also In re Les Halles De Paris J.V., supra*.

The issue to be discussed, therefore, is whether the presence of the word GOLD in applicant's mark YBOR GOLD precludes a finding that the primary significance of the mark, when viewed as a whole, is that of a well-known geographic place.  We find that it does not.  Rather, we find that GOLD is highly suggestive and laudatory, simply

connoting the high quality of the goods, and that it thus does not detract from the geographic significance of YBOR or negate the primarily geographic significance of the mark as a whole. *See, e.g., In re Chatam International Inc.*, 380 F.3d 1340, 1343, 71 USPQ2d 1944, 1946 (Fed. Cir. 2004)(the word GOLD in mark JOSE GASPAR'S GOLD for tequila "describes...a quality of the good commensurate with great value or merit"); *In re Bacardi & Co. Ltd.,* 48 USPQ2d 1031 (TTAB 1997)(in the marks HAVANA SELECT, HABANA CLASICO, OLD HAVANA, HAVANA PRIMO and HAVANA CLIPPER, all for alcoholic beverages, the terms SELECT, CLASICO, OLD, PRIMO and CLIPPER, respectively, do not detract from the primarily geographic significance of HAVANA in each mark, nor do they negate the primarily geographic significance of the marks in their entireties). We cannot conclude that applicant's mere addition of the word GOLD to the geographic designation YBOR results in an arbitrary, fanciful or suggestive composite. Distinguish *In re Sharky's Dry Goods Co.*, 23 USPQ2d 1061 (TTAB 1992)(PARIS BEACH CLUB for t-shirts and sweatshirts held not deceptive under Section 2(a), due to incongruity of elements of mark).

For the reasons discussed above, we find that the primary significance of applicant's mark YBOR GOLD is that of a generally known geographic location. The first

19

element of the Section 2(e)(3) refusal therefore has been met.

**Element 2:  Is the consuming public likely to believe the place identified by the mark indicates the origin of the goods bearing the mark, when in fact the goods do not come from that place?**

We turn next to the second element of the Section 2(e)(3) refusal, i.e., whether "the consuming public is likely to believe the place identified by the mark indicates the origin of the goods bearing the mark, when in fact the goods do not come from that place." *California Innovations, supra*, 329 F.3d at 1341, 66 USPQ2d at 1858. This element involves two issues.  The first is whether there is a goods/place association, and second, whether or not applicant's goods in fact come from the place named. We shall begin with the second of these issues.

By way of background, we note that applicant's address of record, as stated in the original application and as currently reflected in the record of the application, is 441 Vine Street, Suite 3900, Cincinnati, Ohio 45202. Applicant has never filed an amendment changing this address of record.  However, in its request for reconsideration of the final refusal, applicant stated that it "is relocating its office to Tampa where Applicant's

20

goods <u>will</u> originate from." The emphasis on "will" is applicant's; it exists presumably because the Trademark Examining Attorney had rejected as insufficient applicant's earlier statement (in its response to the first Office action) that applicant "is planning on opening an office in Tampa" and that its goods therefore "may very well come from the 'Ybor City' area of Tampa." The Trademark Examining Attorney was not persuaded by this statement and denied applicant's request for reconsideration.

In its main appeal brief, applicant did not raise the issue of its location. However, the Trademark Examining Attorney raised the issue in his appeal brief, noting that "[a]pplicant has not indicated in any of its correspondence the location of its offices in Tampa," and arguing essentially that applicant's statement that it is relocating to Tampa does not necessarily mean that applicant is relocating to the Ybor City area of Tampa, as opposed to another neighborhood in Tampa.

At page 3 of its reply brief, applicant responded by stating expressly that it "has relocated its offices to Tampa, and the goods affixed with the YBOR GOLD mark will originate from Tampa." Applicant argues that "[r]equiring applicant to name its exact location within the city of Tampa exalts form over substance. This is particularly

21

true where the Examining Attorney has failed to set out the geographical boundaries of either Ybor or Ybor City." (Reply brief at 5.) In support of this latter "indefinite boundaries" argument, applicant again relies on the alleged Internet references it cites and quotes for the first time in its reply brief, but which (as noted above) were never properly and timely made of record. Applicant's argument therefore is unsupported by the record. To the contrary, as noted above, the evidence of record (the www.tampa.gov.net excerpt) clearly delineates the geographical boundaries of Ybor City. But even if applicant had made its Internet evidence of record and thus had supported its argument that the boundaries of Ybor City are fluid and not easily determined, applicant's argument still would fail because applicant has not shown that its location is within any of the alternative boundaries or limits of Ybor City that are suggested by applicant's Internet evidence.

With respect to applicant's argument that "[r]equiring applicant to name its exact location within the city of Tampa exalts form over substance," we are not persuaded.[7]

---

[7] Of course, this whole issue could have been resolved if the Trademark Examining Attorney, in response to applicant's statement that it "has relocated" to Tampa, had specifically required applicant, pursuant to Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b), to provide its street address or other proof that it

Rather, we agree with the Trademark Examining Attorney's quite logical contention that just because applicant is located in Tampa does not mean that applicant necessarily is located within the Ybor City section of Tampa, as opposed to some other section of Tampa.[8]

In its reply brief, applicant has referred to an alleged third-party registration of the mark THE LIGHT OF YBOR, in which "the registrant's address is merely listed as a post office box in Tampa, Florida." Applicant argues that "just as the owner of THE LIGHT OF YBOR mark is not required to specify where it is located within the city of Tampa, so too should Applicant be permitted to produce and market its product under the YBOR GOLD mark without the Examining Attorney questioning its street address within

---

was within some recognized boundary of Ybor City. Such a requirement was never made. *See, e.g., In re DTI Partnership LLP,* 67 USPQ2d 1699 (TTAB 2003); *In re SPX Corp.* 63 USPQ2d 1592 (TTAB 2002); *In re Page*, 51 USPQ2d 1660 (TTAB 1999); TMEP §814. However, because this information regarding applicant's location is solely within applicant's control, and is so obviously vital to any attempt by applicant to rebut the Trademark Examining Attorney's prima facie (and logically accurate) showing that applicant, merely by being in Tampa, is not necessarily in Ybor City, we find applicant's failure to produce such information, if available, to be telling.

[8] Applicant argues that, by analogy, even though the team plays its games in New Jersey, the New York Giants professional football team is still allowed to call itself the New York Giants. This contention is not supported by any evidence in the record, but even if it were, we would find it to be unpersuasive.

23

the city limits." (Reply brief at 5.) We are not persuaded.

First, the registration applicant refers to is not of record; applicant has not even provided the registration number. We therefore can give the registration no consideration. Second, even if the registration were of record, it would not prove what applicant says it proves. The fact that the third-party registrant's address of record for purposes of correspondence with the Office is listed merely as a post office box in Tampa does not necessarily mean that the registrant is not located in the Ybor City section of Tampa. For all we know, the examiner may have determined that the registrant in fact was located in Ybor City, either by requiring the applicant to supply such information or as a result of applicant's voluntary disclosure of or reliance on such fact. Such a disclosure by applicant in the present case, which so obviously would overcome the Trademark Examining Attorney's prima facie case in support of the Section 2(e)(3) refusal, is conspicuously absent from the record.

For these reasons, we conclude that the record does not support a finding that applicant's goods will come from Ybor City, the place named in the mark. Therefore, this

24

prong of the second element of the Section 2(e)(3) refusal therefore is satisfied.

We turn next to the first prong of the second element, i.e., whether there is a goods/place association between the "cigars" identified in applicant's application and the place named in the mark, Ybor City.

On this issue, the Federal Circuit has stated:

> In a case involving goods, the goods-place association often requires little more than a showing that the consumer identifies the place as a known source of the product. ... Thus, to make a goods-place association, the case law permits an inference that the consumer associates the product with the geographic location in the mark because that place is known for producing the product.

*In re Les Halles De Paris, supra*, 334 F.3d at 1373-74, 67 USPQ2d at 1541 (internal citations omitted).  In the case of *In re Loew's Theatres, Inc., supra*, 769 F.2d at 768, 226 USPQ at 868 (a pre-NAFTA case which the court subsequently has stated (in *California Innovations, supra*) is still good law with respect to the "goods/place association" requirement of a Section 2(e)(3) refusal), the court noted that to establish a goods/place association, the PTO need not show that the place is well-known or noted for the goods; rather, "...the PTO must show only a reasonable basis for concluding that the public is likely to believe

25

the mark identifies the place from which the goods originate..." The *Loew's Theatres* court, in a further statement of the rule which was quoted by the court in the *California Innovations* case, held that

> [t]he PTO's burden is simply to establish that there is a reasonable predicate for its conclusion that the public would be likely to make the particular goods/place association on which it relies... The issue is not the fame or exclusivity of the place name, but the likelihood that a particular place will be associated with particular goods.

*California Innovations, supra*, 329 F.3d at 1338, 67 USPQ2d at 1855, quoting from *In re Loew's Theatres, supra*, 769 F.2d at 767-69, 226 USPQ at 868.

In the present case, the evidence of record shows that the relevant purchasing public, i.e., cigar aficionados who visit or read about Ybor City, as well as other visitors or potential visitors to Tampa and to the Ybor City area of Tampa, are likely to make a goods/place association between Ybor City and cigars. The Ybor Times website informs visitors and potential visitors that "[t]oday, the streets of Ybor City are again home to a slew of cigar stores and carts." The website goes on to list the names, addresses and phone numbers of ten retail cigar stores, twelve mail order cigar retailers, and four cigar manufacturers, all

26

located in Ybor City.  Frommer's travel guide informs visitors and potential visitors that Ybor is "one of the best places in Florida to buy hand-rolled cigars."  Fodor's travel guide informs visitors and potential visitors to Ybor City that "[g]uided walking tours of the area ($5) enable you to see artisans handroll cigars following time-honored methods."

This evidence suffices to establish the requisite "reasonable predicate" for concluding that the relevant purchasing public is likely to make an association between cigars and Ybor City, i.e., that they are likely to regard Ybor City as a "known source" for cigars.

For the reasons discussed above, we find that the evidence of record establishes that there is a goods/place association between Ybor City and cigars, and we cannot conclude on this record that applicant's YBOR GOLD cigars in fact will come from Ybor City.  We conclude, therefore, that the second element of the Section 2(e)(3) refusal has been met.

**Element 3:  Would the mark's misrepresentation materially affect the public's decision to purchase the goods?**

The third and final element of the Section 2(e)(3) refusal requires us to determine whether the association

27

between Ybor City and applicant's cigars which is evoked (falsely) by applicant's YBOR GOLD mark would materially affect the relevant public's decision to purchase applicant's goods. The materiality element may be established by evidence showing that the place named in the mark is "famous as a source of the goods at issue." *In re Les Halles De Paris, J.V., supra,* 334 F.3d at 1374, 67 USPQ2d 1542, citing *California Innovations, supra*, which itself cites *House of Windsor, supra*. In *California Innovations,* the court, citing its prior case law, likewise stated that the materiality element may be established by a showing that the goods in question are "a principal product" of the place named in the mark, that the place is "noted for" or "renowned for" such goods, or that the goods are, or are related to, the "traditional" products of the place named in the mark. *California Innovations, supra*, 329 F.3d at 1341, 66 USPQ2d at 1857, citing, variously, *In re Save Venice New York, supra; In re Wada, supra, In re Loew's Theaters, supra,* and *In re House of Windsor, supra*.

We find, under any and all of these formulations of the materiality test, that the goods/place association (falsely) evoked by applicant's mark would be material to the relevant public's decision to purchase applicant's cigars. Although applicant is correct in noting that Ybor

28

City currently is prominently known as a destination for both tourists and locals featuring nightlife, restaurants, art galleries and shopping, the evidence of record clearly shows that cigars are "a principal product" of Ybor City. Within the confines of Ybor City, there are no fewer than ten cigar stores, twelve mail order cigar retailers, four cigar manufacturers, and an indeterminate number of sidewalk cigar "carts." This concentration of cigar manufacturers and sellers suffices to establish that cigars are "a principal product" of Ybor City. Indeed, Frommer's travel guide informs visitors and potential visitors that Ybor City is "one of the best places in Florida to buy hand-rolled cigars."

Moreover, the evidence of record establishes that Ybor City is noted for, renowned for, and indeed famous for its cigars and its cigar history, and that cigars are known as a "traditional" Ybor City product. It was once "the cigar capital of the world" and "Cigar City USA," where 140 cigar factories produced 250 million cigars each year. Even if it no longer can boast such numbers, it is clear that Ybor City actively relies on its cigar-dominated history and present as a crucial element of its tourism marketing. The Fodor's and Frommer's travel guides, as well as local information sources such as the Ybor Times and the Ybor

29

City Chamber of Commerce, inform the public that "...the smell of cigars – hand-rolled by Cuban immigrants – still wafts through the heart of this east Tampa area...," and that "[g]uided walking tours of the area ($5) enable you to see artisans handroll cigars following time-honored methods." Ybor City's visitor center, housed inside "the Cigar Museum," is "designed as an opened cigar box" and includes "cigar art" and "a historical film theater" which presumably presents films pertaining to the area's cigar history. The museum itself "provides a look at the history of the cigar industry," and features a "collection of cigar labels," "cigar memorabilia" and "a renovated cigar worker's cottage...furnished as it was at the turn of the last century."

Applicant argues that "[t]he Examining Attorney incorrectly considers an antiquated version of Ybor City, rather than its present-day incarnation" as Tampa's "Latin Quarter" tourist destination. (Applicant's brief at 6.) "While applicant concedes that Ybor City was at one time in the past famous as a source for cigars, its current fame is only as a former source for such goods." (Id.) Indeed, applicant argues, "...Ybor City's central attraction is a Cigar Museum, dedicated to reminding visitors of the area's former industry. No such reminder would be required, if

the industry were still vital." (Id.) We are not persuaded by these arguments.

As noted above, cigars clearly are and remain "a prominent product" of Ybor City, in view of the dense concentration of cigar retailers and manufacturers located within its confines. Moreover, cigars clearly have been shown to be a "traditional" Ybor City product, a fact which in itself may suffice to support a finding of materiality. *In re Save Venice New York, supra.* Even if Ybor City is no longer producing cigars at the level it did in its heyday as the "cigar capital of the world," its emphasis on and celebration of its cigar culture, both present and historical, remains a significant and indeed prominent feature of the area's appeal. Given the prominence of Ybor City as both a current and an historical source of cigars, we find that purchasers are likely to mistakenly assume that applicant's cigars sold under the mark YBOR GOLD are associated with or have some connection to Ybor City, and we further find that such assumption would be material to the decision to purchase the goods. Persons encountering Ybor City, for example a cigar aficionado who visits Ybor City or who perhaps reads about Ybor City in a cigar magazine like Cigar Aficionado, will readily learn and understand that Ybor City is famous as a source for cigars.

31

When he or she returns home from a trip to Tampa and to Ybor City, and encounters applicant's YBOR GOLD cigars at his or her local tobacconist, he or she undoubtedly will assume that the cigars come from or have some connection to Ybor City. Given the prominence of Ybor City as both a current and an historical source of cigars, his or her decision to purchase the cigars undoubtedly will be materially and favorably affected by that (mistaken) assumption.

For these reasons, we conclude that the evidence of record supports the materiality element of the Section 2(e)(3) refusal.

**Conclusion and Decision.**

Based on the evidence of record and for the reasons discussed above, we find that all three of the elements of the Section 2(e)(3) refusal have been met. The primary significance of applicant's mark is that of a generally known geographic place; there is a goods/place association, and applicant's goods will not come from the place named; and such goods/place association arising from use of applicant's mark would be material to the decision to purchase applicant's goods. We have considered all of applicant's arguments and evidence to the contrary, but are

32

not persuaded that our conclusion is erroneous.

Decision:  The Section 2(e)(3) refusal is affirmed.[9]

---

[9] As discussed above toward the beginning of this decision, we deem the Section 2(a) deceptiveness refusal to be unnecessary and moot in this case involving a geographically deceptively misdescriptive mark.  We also find that applicant's proffered disclaimer of YBOR does not overcome the Section 2(e)(3) refusal.